IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Criminal Action No. 3:13-CR-128-L-1 |
| | § | |
| STERIC PAUL MITCHELL, | § | |
| | § | |
| Defendant. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the court is Defendant Steric Paul Mitchell's ("Mitchell" or "Defendant") Motion for Acquittal and New Trial (Doc. 282), filed September 4, 2015. After careful review of the motion, response, reply, supplement, record, and applicable law, the court **denies** Defendant's Motion for Acquittal and New Trial.

**I.      Background**

On April 10, 2013, Defendant was named in a four-count indictment ("Indictment") charging him with Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. § 1201(a); Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and (2);  Kidnapping, in violation of 18 U.S.C. §§ 1201(a)(1) and (2); and Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922 (g)(1) and 924(e)(1). On September 26, 2013, the court granted Defendant Steric Paul Mitchell's Motion to Sever Count Four of the Indictment and severed this count.  Counts One, Two, and Three proceeded to trial.

After one and one-half days of jury selection, the trial of this action began on August 11, 2015, and continued until August 20, 2015.  On August 18, 2015, after the Government rested, Defendant orally moved for acquittal pursuant to Federal Rule of Criminal Procedure 29(a).  The

court, although it had reservations as to the sufficiency of the evidence with respect to Count Two, ultimately determined that all three counts should go to the jury and denied the oral motion for acquittal.

On August 21, 2015, the jury returned its verdict, and Mitchell was found "guilty" on Counts One and Three of the Indictment, Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. § 1201(a), and Kidnapping, in violation of 18 U.S.C. §§ 1201(a)(1) and (2). He was found "not guilty" on Count Two of the Indictment, Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and (2). Defendant thereafter filed a written motion for acquittal pursuant to Federal Rule of Criminal Procedure 29(c) with respect to Count One of the Indictment, Conspiracy to Commit Kidnapping, and a motion for new trial with respect to Count One and Count Three of the Indictment, Kidnapping.

## II.     Legal Standards

### A.       Federal Rule of Criminal Procedure 29—Motion for Acquittal

Rule 29(a) of the Federal Rules of Criminal Procedure provides that after the Government closes its evidence or after the close of the all the evidence, on a defendant's motion, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In determining whether there is sufficient evidence to support a conviction, the court must determine "whether a rational juror could have found the elements of the offense proved beyond a reasonable doubt. In so doing, we view the evidence in the light most favorable to the Government, with all reasonable inferences and credibility choices made in support of the jury verdict." *United States v. Valles*, 484 F.3d 745, 752 (5th Cir. 2007) (internal footnotes and citation omitted). As the jury is "free to choose among reasonable constructions of the evidence, and retains the sole authority to weigh conflicting evidence and evaluate the credibility of witnesses,

it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Holmes*, 406 F.3d 337, 351 (5th Cir. 2005) (internal quotation marks and citations omitted). As the Fifth Circuit aptly observes, "It is by now well settled that a defendant seeking reversal on the basis of insufficient evidence swims upstream." *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997). Further, a court is not to "second guess the jury in its choice of which witnesses to believe." *United States v. Zuniga*, 18 F.3d 1254, 1259 (5th Cir. 1994).

### B.       Federal Rule of Criminal Procedure 33—Motion for New Trial

Rule 33(a) of the Federal Rules of Criminal Procedure allows the court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." A motion for a new trial should not be granted "unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict. A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant." *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004).

In expounding on this standard and to assist district courts in deciding whether to grant a Rule 33 motion, the Fifth Circuit has stated the following:

> In determining whether to grant the motion, the district court must carefully weigh the evidence and may assess the credibility of the witnesses during its consideration of the motion for new trial, but must not entirely usurp the jury's function, or simply set aside a jury's verdict because it runs counter to result the district court believed was more appropriate.
>
> Setting aside a jury's guilty verdict in the interests of justice may be appropriate under circumstances [when] the evidence brought forth at trial may tangentially support the verdict, but in actuality, preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred. Similarly, while vested with discretion to grant a new trial pursuant to Rule 33 if necessary in accordance with the interests of justice, we have observed that this power should be exercised infrequently by district courts, unless warranted by exceptional circumstances.

*United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (internal quotation marks and citations omitted).

## III.   Analysis

### A.   The Court's Instructions Regarding Counts One and Three

The court carefully considered existing Supreme Court and Fifth Circuit precedent when preparing and submitting the jury charge in this case. The court now sets forth the elements of Counts One and Three as it did in its instructions to the jury.

To find Defendant Mitchell guilty of Count One, Conspiracy to Commit Kidnapping, the Government had to prove each of the following beyond a reasonable doubt:

First:        That Defendant Mitchell and at least one other person made an agreement to commit the crime of conspiracy to kidnap [K.R.] as charged in Count One of the Indictment;

Second:        That Defendant Mitchell knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

Third:        That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the Indictment, to accomplish some object or purpose of the conspiracy.

A "conspiracy" is an agreement between two or more persons to join together to accomplish some unlawful purpose. It is a kind of "partnership in crime" in which each member becomes the agent of every other member.

One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators. If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him for conspiracy even though such defendant had not participated before and even though such defendant played only a minor part.

The [G]overnment need not prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme. Similarly, the [G]overnment need not prove that all of the details of the scheme alleged in the Indictment were actually agreed upon or carried

out; nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way that advances some purpose of a conspiracy, does not thereby become a conspirator.

The elements of kidnapping are explained to you and set forth in the instructions relating to Count Three. You are directed to read these instructions before you reach a decision as to Count One.

Ct.'s Instrs. to the Jury (Aug. 20, 2015) 14-15.

To find Defendant Mitchell guilty of Count Three, Kidnapping, the Government had to

prove each of the following beyond a reasonable doubt:

| | |
|---|---|
| First: | That Defendant Mitchell, knowingly acting contrary to law, seized, confined, inveigled, kidnapped, abducted, carried away, or held [K.R.] as charged in Count Three of the Indictment; |
| Second: | That Defendant Mitchell held her for some purpose or benefit; and you need not unanimously agree on why a defendant kidnapped the person in question, so long as you each find that he had some purpose or derived some benefit for the kidnapping. |
| Third: | That Defendant Mitchell used instrumentalities of interstate commerce in furtherance of the kidnapping. |

To "kidnap" a person means to unlawfully hold, keep, detain, or confine the person against that person's will. Involuntariness or coercion in connection with the victim's detention is an essential part of the offense. To "inveigle" a person means to lure, entice, or lead the person astray by false representations or promises, or other deceitful means.

You are instructed that motor vehicles and cellular phones are instrumentalities of interstate commerce.

*Id.* at 18.

### B.    Motion for Acquittal—Count One

Defendant moves for acquittal pursuant to Rule 29, or in the alternative, a new trial pursuant to Rule 33 on Count One, Conspiracy to Commit Kidnapping in violation of 18 U.S.C. § 1201(c).  Mitchell contends that the evidence presented to the jury was so scant that the jury could only speculate to two of the essential elements of the charge.  He contends that the testimony and the text messages presented as evidence are insufficient to prove beyond a reasonable doubt that he made an agreement to kidnap K.R. Mitchell further contends that K.R.'s testimony was legally suspect and incredible.  He asserts that her testimony was contradictory and inconsistent, and that she was impeached on numerous occasions with her prior inconsistent statements.  Mitchell contends that K.R. admitted to being addicted to drugs and under the influence of drugs during the relevant period.  He also contends that K.R.'s testimony was unsupported and that no reasonable jury could believe her beyond a reasonable doubt.  The court disagrees.

Determining the credibility of a witness falls exclusively within the province of the jury, and the jury is the sole judge of a witness's believability or credibility.  In explaining the jury's duty regarding credibility of witnesses, the court instructed the jury as follows:

### Credibility of Witnesses

I remind you that it is your job to decide whether the [G]overnment has proved Defendant Mitchell guilty beyond a reasonable doubt.  In doing so, you must consider all of the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given the witness's testimony.  An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.  You should decide whether you believe all or any part of what each person had to say and how important that testimony was.  In weighing and deciding credibility, consider the following:  Did the witness impress you as honest?  Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case?  Did the witness have any relationship with either the [G]overnment or the defense?  Did the witness seem to have a good

memory?  Did the witness clearly see or hear the things about which he or she testified?  Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?  Did the witness's testimony differ from the testimony of other witnesses?  These are some, but not all, of the considerations that will help you determine the accuracy of what each witness said.

Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say.  In other words, you may accept all of the testimony of a witness; you may accept only part of it; or you may reject the witness's testimony entirely.  In reaching your verdict, however, do not make any decision simply because there may have been more witnesses on one side than on the other.  Your duty is to decide whether you believe what each witness had to say and how important that testimony was.

The testimony of a single witness, that produces in your minds the belief in the likelihood of truth beyond a reasonable doubt, is sufficient for the proof of any fact, even though a greater number of witnesses may have testified to the contrary, if you believe this witness and have considered all the other evidence.  In other words, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact.  You may find the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

Ct.'s Instrs. to the Jury 5-6.

The court also included an instruction regarding inconsistences in a witness's testimony.

In this regard the court instructed the jury as follows:

### Impeachment by Prior Inconsistencies

The testimony of a witness may be discredited by showing that the witness testified falsely, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the testimony that the witness gave at this trial.

Earlier statements of a witness were not admitted into evidence to prove that the contents of those statements are true. You may not consider the earlier statements to prove that the content of an earlier statement is true; you may only use earlier statements to determine whether you think the earlier statements are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness. If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves.

*Id*. at 7.

**Memorandum Opinion and Order – Page 7**

The jury had the duty to decide whether it believed K.R. and how important her testimony was.  The jury was also instructed that it had the exclusive right to give inconsistent testimony the weight that it thought such testimony deserved.  *Id.* Further, the court included instructions to the jury regarding any witness's use of addictive drugs, which stated:

> The testimony of a witness who is shown to have used addictive drugs during the period of time about which the witness testifies must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.  You should never convict a defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

*Id.* at 8.

Finally, the court included an instruction subtitled, "**Impeachment by Evidence of Untruthfulness**," and instructed the jury as follows: "You have heard the testimony of Brent Montoya about whether [K.R.] is a truthful person.  It is up to you to decide from what you heard here whether [K.R.] was telling the truth in this trial."  *Id.*

While there were certainly a number of inconsistencies in K.R.'s testimony, that is not the end of the story.  What is important is that the jury ultimately believed her as to Count One, as well as Count Three.  The jury observed her testimony and considered all of the evidence.  The jury could well have believed that the inconsistencies in her testimony: (1) were due to the passage of time that occurred; (2) were due to the trauma of the kidnapping and sexual assault that it believed occurred; (3) related to matters that were unimportant or incidental to the essential elements of the crimes charged; (4) were attributable to an innocent lapse of memory on K.R.'s part; or (5) were the result of K.R.'s use of antianxiety medication or some other drug during her interviews with police personnel.  Notably, K.R. testified to the acts and conduct of codefendant Gregory Hunt ("Hunt"), Mitchell himself, and others before she went to the house on Wheatland Road, which was the first house.  She testified as to what Mitchell did and said to her before the

sexual assault by Hunt.  According to K.R., when Hunt physically took steps to have sex with her, she called out to Mitchell.  Mitchell told K.R. to do whatever Hunt told her to do.  Further, K.R. testified that Mitchell either stood in the doorway or near the doorway in the room while Hunt sexually assaulted her in that room.   She described Hunt's conduct before the sexual assault, how Hunt sexually assaulted her, and what he did during the assault and afterwards.  K.R. testified in detail that after Hunt sexually assaulted her, she tried to escape, but Mitchell chased her down, tackled her, beat her with his fists a number of times, and brought her back to the house.  Further, K.R. testified in detail that Mitchell took her to a second house (the Michigan Avenue house in Dallas, Texas) and sexually assaulted her.  Finally, K.R. testified how Mitchell took her to a third house on Willowbrook (the Duncanville house) and how she was able, after three or four attempts, to contact the Duncanville Police Department and ultimately run to the safety of members of the Duncanville Police Department.

The inconsistencies of K.R., as well as those statements Mitchell perceives as inconsistencies, were discussed in detail, and weighed and considered by the jury.  The court, of course, is not limiting its decision to K.R.'s testimony.  There is an abundance of other evidence and testimony that supports the jury's decision at to Count One, as well as Count Three.  This includes the testimony of members of the Duncanville Police Department, testimony of other persons, evidence found at the three houses, scientific analyses conducted on some of the evidence, and numerous photographs taken of K.R. and the crime scenes.  Of particular importance is the testimony of Detective David Moon of the Duncanville Police Department and lead investigator who interviewed Mitchell.  Mitchell was given his *Miranda*[1] warning prior to the interview.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

**Memorandum Opinion and Order – Page 9**

During this interview, which was played in part before the jury, Mitchell stated that he found K.R. walking along the side of the road sometime between midnight and one o'clock in the morning, that she had zip ties around her ankles, and that he removed the zip ties from K.R.'s ankles once she was in his truck.  Mitchell also stated that he and K.R. drove around for several hours, visited some of his friends, and went to his ex-wife's house later that morning.   Mitchell portrays himself as K.R.'s rescuer.

A jury does not discard its common sense when deliberating on a case, and the compelling question that a reasonable jury would necessarily ask is: "Why would a woman turn on her rescuer, call the Duncanville Police Department, frantically run from house into the arms of a police officer, and accuse her rescuer of kidnapping and raping her?"  Further, a reasonable jury would muse as to why Mitchell, as K.R.'s rescuer, did not call the police or take K.R. to a police station, given the alleged circumstances under which he encountered her.  The story painted by Mitchell strains credulity, and the jury was well within its province to dismiss and reject Mitchell's story as nonsensical.  Mitchell's implausible account of how he encountered K.R. served as a basis to inculpate him with respect to Counts One and Three rather than exculpate him.  Bluntly stated, Mitchell's interview with Moon, did not portray him as a credible witness, which was something the jury was certainly entitled to consider in finding him Guilty on Count One, as well as Count Three.  Undoubtedly, Mitchell's statements during the interview played a large role in the jury finding him guilty as to Counts One and Three, although he seems to be dismissive of this reality and goes on the attack against K.R.

The court is convinced that the jury carefully listened to and examined K.R.'s testimony. This is so in large part because the jury returned a "not guilty" verdict with respect to Count Two. K.R.'s testimony was a "weak cup of tea" on this count, and, as the parties will recall, the court,

outside the presence of the jury, questioned the sufficiency of the evidence relating to Count Two but nevertheless let it proceed to the jury for determination.  The court's concerns were validated when the jury found Mitchell "not guilty" on Count Two.  The jury's decision establishes that it was able to assess K.R.'s credibility, sift through the facts, and properly weigh the evidence during the course of the trial.  The jury determined that K.R.'s testimony and the evidence pertaining to Count Two were insufficient to establish beyond a reasonable doubt that Mitchell had committed each of the essential elements of this offense.  That the jury found Mitchell "not guilty" on Count Two informs the court that the jury, rather than accept K.R.'s testimony in a wholesale manner, meticulously and painstakingly considered it.  Accordingly, no amount of legal prestidigitation can convince this court that the jury fell short of performing its duty as to Count One or Three. The evidence in the trial established beyond a reasonable doubt each of the essential elements of Count One, as well as Count Three.  As the court is convinced that the jury carefully considered all of the evidence and weighed the testimony of all witnesses, including that of K.R., it will deny Defendant's Motion for Acquittal as to Count One.

### C.    Motion for New Trial—Counts One and Three

#### 1.    No Miscarriage of Justice

Defendant moves for a new trial pursuant to Rule 33 on Counts One and Three, and he relies on many of the same arguments made with respect to Defendant's motion for acquittal. Accordingly, there is no need for the court to replicate any of its earlier determinations, except where necessary for emphasis.

Mitchell contends that the Government's case was almost entirely dependent on K.R.'s testimony and she was "completely and thoroughly" impeached; the evidence the Government used to "prop up" K.R.'s testimony was weak; and the Government engaged in unfair tactics.

Mitchell asserts that K.R.'s testimony was inconsistent and that those inconsistencies made her testimony unbelievable and legally incredible.  Defendant contends that the physical evidence did not corroborate any part of K.R.'s story, except that she and Mitchell had sex at the Michigan location, which he now contends was never in question and was consensual.[2]  As previously stated, the court disagrees with Defendant's assessment of evidence in this case.

Although the court has reweighed the evidence in this case and made credibility assessments as to the witnesses, which it may do with respect to a motion for new trial, it focuses primarily on the testimony of K.R., as Defendant describes K.R. as the Government's star witness and contends that its case was based primarily on her testimony.

As previously stated, there are inconsistencies in K.R.'s testimony, and some matters that Defendant labels as inconsistencies are not in reality inconsistencies.  One of the most relevant examples in assessing K.R.'s testimony was performed when Mitchell's counsel questioned retired Dallas police detective Otis K. Griffith extensively about matters that he perceived as inconsistent statements made by K.R.  Defense counsel also questioned a number of other witnesses on statements he thought were inconsistent or improbable; however, the point that the court wishes to make is best illustrated by the testimony of Griffith.

Griffith interviewed K.R. twice.  As a result of his second interview, Griffith raised some thirty or so matters of concern that he believed cast doubt on K.R.'s account of what transpired between her, Mitchell, and Hunt.  Mitchell used Griffith to impeach K.R.'s credibility.  Griffith first conducted a phone interview with K.R. shortly after the incident and conducted a later in-person interview with her several weeks later.  According to Griffith, some of what K.R. said in

---

[2] Had scientific analyses not established that sex took place between Mitchell and K.R., he undoubtedly would have asserted that it never occurred.  This is why the Government took steps through experts to show that sex had occurred between Mitchell and K.R.

the second interview, which lasted approximately three hours, appeared to be inconsistent with what she said in her interview with the Duncanville Police Department and her phone interview with him.

Griffith testified that K.R. appeared to be under the influence of some kind of antianxiety medication during the second interview.  The detective acknowledged that he should not have proceeded with the second interview when K.R. was under the influence of or taking antianxiety medication.  The exchange between Mitchell's counsel and Griffith on this matter proceeded as follows:

Counsel:       Would you tell the members of this jury what you observed regarding K.R.'s demeanor during the second interview, the June 1, 2012 interview?

Witness:        She was somewhat lethargic, speech slurred some.

Counsel:       Based upon what you observed, do you have an opinion about what state she appeared to be in emotionally or otherwise?

Witness:        Yes, sir.

Counsel:       What is that?

Witness:        She appeared to me to be emotionally unstable and probably under the influence of like an antianxiety drug.

Counsel:       How are you able to say that based upon what you observed regarding the drug part?

Witness:        From working years in narcotics and having had antianxiety drugs prescribed for me before.

On cross examination, the Government's counsel followed up on this topic with Griffith:

Counsel:       Is it proper for detectives to interview witnesses or victims, alleged victims, when a detective believes that person is under the influence?

Witness:        I probably should not have interviewed her as I look back now.

| | |
|---|---|
| Counsel: | Because as you testified, she had some slurred speech that second time she met with you? |
| Witness: | Yes, sir. |
| Counsel: | And you even stated that you believed her to be under the influence of an antianxiety drug? |
| Witness: | Yes, sir. |
| Counsel: | In fact, you previously stated that she didn't appear to be able to think quickly during that interview? |
| Witness: | Correct. |
| Counsel: | So you admit it probably was a mistake to interview her that time? |
| Witness: | Yes, sir. |
| Counsel: | While she was in that condition? |
| Witness: | Yes, sir. |
| Counsel: | The second interview in person was how long? |
| Witness: | About three hours. |
| Counsel: | Significantly longer than the phone interview? |
| Witness: | Yes, sir. |

Mitchell's counsel examined Griffith methodically and with surgical precision, and the Government's counsel countered effectively and pointed out that Griffith should not have interviewed K.R. when he did.  The obvious takeaway and logical inference from Griffith's testimony are that the abilities of a person on antianxiety medication or drugs to recall or relate details may be impaired or diminished under such circumstances.  As a result, details may be omitted, appear out of sequence, or explained differently from a previous or subsequent time.

These were matters that were assessed by the jury in conjunction with K.R.'s testimony, and the jury ultimately decided that K.R.'s testimony was sufficiently credible for convictions with

respect to Count One, as well as Count Three.  Moreover, in assessing K.R.'s credibility, weighing the evidence, putting her testimony in its proper context, and taking into account reasonable explanations for and the importance of any inconsistencies or discrepancies, the court concludes that the jury's verdict with respect to Counts One and Three is supported by proof beyond a reasonable doubt.  The court further concludes that the evidence with respect to Counts One and Three does not "preponderate[] sufficiently heavily against the verdict such that a miscarriage of justice may have occurred," and that the evidence does not establish that "exceptional circumstances" warrant a new trial.  *U.S. v. Tarango,* 396 F.3d at 572.  The court now addresses several other arguments that Defendant contends warrant a new trial.

### 2.   The "False" Handgun

Mitchell contends that the Government's introduction of a handgun that K.R. could not identify was one of several "hardball" tactics used by the Government.  Even though Mitchell was acquitted on Count Two, he contends that the "spillover" effect of having a gun in the courtroom cannot ever be known.  The Government contends that it did nothing improper.

Given the level of preparation by the Government to try this case, the court would be flabbergasted if the Government did not know whether K.R. could identify the gun prior to trial.  At trial, on direct examination, K.R. could not even remember what the gun "looked like" or whether it was a pistol or shotgun.  On cross-examination, and after at least one recess in the trial testimony, she does a reversal and purports to be able to recognize the gun, even though she earlier testified that she could not remember what the gun "looked like" or whether it was a pistol or shotgun on Mitchell's side at the Wheatland house.  This brand of gamesmanship and legerdemain is to be avoided and is no cause for approbation.  If the Government did not know what K.R.'s testimony was going to be regarding the handgun, it should not have proceeded with Count Two,

and unnecessarily "muddied the water," as its role is to seek justice, not to obtain a conviction at all costs.

Understandably, the Government's disingenuous and underhanded approach backfired, as the jury saw how flimsy the evidence was on Count Two and found Mitchell "not guilty." The jury was able to assess the paucity of evidence relating to Count Two, and no "spillover" prejudice existed, as the jury was able to put the evidence in its proper context.

### 3.    Invocation of Hunt's Fifth Amendment Rights

Mitchell contends that the Government threatened Hunt into silence so that he would not be able to appear as a witness for him. In his plea agreement, Hunt pleaded guilty to Count Three, Kidnapping. Plea Agreement of Hunt (Apr. 8, 2015). Hunt agreed to "give complete and truthful information and/or testimony regarding his participation in the offense[] of conviction." *Id.* at 3. The Government agreed "not [to] bring any additional charges against Hunt based upon the conduct underlying and related to the defendant's plea of guilty. The [G]overnment will dismiss, after sentencing, any remaining charges in the pending Indictment." *Id.* Hunt was rearraigned before United State Magistrate Judge Renée Harris Toliver on April 21, 2015, and he pleaded guilty to the Kidnapping charge. The court accepted the recommendation of Judge Toliver and adjudged Hunt guilty of violating 18 U.S.C. § 1201(a)(1), Kidnapping.

On August 12, 2015, the Government's counsel requested a bench conference, and the court allowed the conference to take place. In anticipation of the defense expecting to call Hunt, the Government had requested earlier that Hunt, who was in custody, be brought over to the court house with his attorney. According to the Government's attorney, it wanted to determine whether Hunt "would cooperate" or testify, and the Government discussed Hunt's factual resume with him and his attorney. The Government's counsel also informed the court that there were two other

counts against Hunt and that Hunt's counsel informed the Government's counsel that Hunt's counsel informed him that he did not believe Hunt wanted to waive his Fifth Amendment right against self-incrimination.   Because Hunt was also charged in Counts One and Two, the Government's counsel stated, "Obviously, if Mr. Hunt were to be called to the stand, he potentially could incriminate himself regarding the two offenses [Counts One and Two] that have not been dismissed."

After much discussion, the court made it clear that the Government's position was questionable.  The court stated that it was beginning to wonder whether the story about potential incrimination was something to hold over Hunt's head to prevent him from testifying favorably on behalf of Mitchell.  The court could not fathom why the Government believed that Hunt could potentially incriminate him, as it set forth no factual basis for its belief, especially since Hunt's factual resume clearly implicated Mitchell in some of the criminal activity.  From the record developed, the Government merely raised the possibility of self-incrimination.  The court strongly suspected, and still does, that the Government employed this tactic to silence Hunt; however, the issue was never fully developed by Mitchell.  Although Hunt's counsel told the court that he would probably invoke Hunt's Fifth Amendment right against self-incrimination, the court offered to resolve the issue and was fully prepared to hold a hearing and make a determination; however, Mitchell's counsel's stated that he did not believe the issue could be resolved at that juncture.  The court noticed that the subject had been broached, and Mitchell's counsel stated that he would let the court and Hunt's counsel know whether he would call Hunt but that, based upon what he heard, he was not inclined to call Hunt.  The last statement made on the matter by Mitchell's counsel was that he needed "to think about it."

Although the court did not approve of the Government's "hardball" tactics, whether or not Hunt could have successfully invoked his Fifth Amendment rights was never determined. The court, *not the Government*, decides whether a defendant can properly invoke his Fifth Amendment right against self-incrimination. "The trial court should inquire into the legitimacy and scope of the privilege to assess the credibility of the witness's fear of self-incrimination before excluding the testimony of that witness." *United States v. Mares*, 402 F.3d 511, 514 (5th Cir. 2005) (citation omitted). "[A] court enjoy[s] wide discretion in resolving a self-incrimination claim." *United States v. Brooks*, 681 F.3d 678, 711 (5th Cir. 2012). Further, the court, not the Government, decides whether a party has breached a provision of the plea agreement. Mitchell, by not raising the issue again, even though the court left it open, waived the Fifth Amendment issue. The Government ran a bluff; however, rather than challenge the Government and even Hunt's counsel, if necessary, Mitchell elected not to call Hunt. The court, therefore, never had an opportunity to perform its role. Mitchell waived his right for the court to resolve the issue of self-incrimination regarding Hunt.

### 4.    Rule 412 Evidence and K.R.'s Alleged Prostitution

Mitchell contends that he was prevented from telling the jury that K.R. was a prostitute. The problem with this contention is that it was not supported by even a scintilla of evidence. What Defendant put before the court was speculation and vague references that K.R. was a prostitute. Nothing was supported by credible evidence.

The court based its ruling on Federal Rule of Evidence 412. This rule allows evidence involving alleged sexual misconduct in only three instances. Defendant sought admission of the evidence under the third exception, which allows the admission of "evidence whose exclusion would violate the defendant's constitutional rights." Fed. R. Evid. 412(b)(1)(C).

**Memorandum Opinion and Order – Page 18**

As part of his argument that a prostitution agreement was improperly kept from the jury, Mitchell argues that a text exchange establishes the K.R. was a prostitute.  The operative language of the text is as follows:  "JD SAID U Manage a dancer my plug is in town I want to show him a good time its 400$ for her 100 $ for u if u can make it happen[.]"  A plug is one who supplies or provides drugs to another person.

Mitchell takes the position that the phrase "show him a good time" is a code word for prostitution; however, the phrase is used in conjunction with the word "dancer."  Subsequent texts use the word "dance."  The court fully recognizes that in the netherworld of drugs, prostitution, sex slavery, and vice that phrases such as "show me a good time," "be nice to me," "treat me right," "make it worth my time," or similar phrases can be meant to refer to sexual activity; however, without something more substantial, the court cannot impermissibly presume that "show me a good time" was sufficient to establish, or tended to establish, that K.R. was a prostitute.  If Mitchell truly believed that the phrase was a reference to prostitution, he should have developed that testimony rather than offer the court unsubstantiated conjecture and speculation.  Under the totality of the circumstances, the use of the phrase "show me a good time" is simply too slender of a reed for the court to conclude that K.R. was engaged in prostitution.

After listening to the parties argue for some time about K.R. allegedly engaging in prostitution, the court concluded that the statements regarding alleged prostitution would not be allowed at the early stages of the trial because the issue had not been sufficiently developed by Mitchell.  The court proceeded cautiously because too much of Defendant's argument was based on hearsay, speculation, or conjecture.  Supposedly, Hunt, Mitchell and Rachel Ellinger could provide testimony that K.R. was engaged in prostitution; however, none of these persons was called by Mitchell to testify.  The court only made a preliminary ruling and specifically informed

Mitchell that if evidence were developed that established, or tended to establish, K.R. was engaged in prostitution, it would revisit the issue.

Mitchell never again raised the issue during the trial regarding K.R.'s alleged engagement in prostitution, even though the court left the door open. As the court left the door open to revisiting the prostitution allegation, Mitchell never called Ellinger to testify, even though the court swore her in at the beginning of the trial as a defense witness and expected her to be called to testify later in the trial. The court is stunned by Mitchell's contention that it did not call Ellinger because of the proffer made by Mitchell regarding K.R.'s alleged engagement in prostitution. The court made it unequivocally clear that Mitchell's proffer was insufficient to allow the evidence to be admitted. At that time, Mitchell knew that he would need Ellinger, Hunt, or himself to testify regarding K.R.'s alleged engagement in prostitution. The only reasonable explanation is that no witnesses were able to support Mitchell's theory that K.R. was a prostitute. Had Mitchell carried his burden, the court would have held a follow-up Rule 412 hearing.

The court never held that Mitchell's prostitution theory was bogus; it only demanded evidence to show that more than speculation, illogical inferences, or conjecture existed to support his theory. Mitchell at no time ever came forward with a witness to give credence to the prostitution theory, despite the court leaving the door open for him to do so. Given Mitchell's trial strategy, had the court allowed Mitchell to delve into the prostitution allegation based on the scanty "evidence," Mitchell would have inquired about it in front of the jury and not called a single witness to testify about K.R.'s alleged prostitution, and the unmistakable inference would have been that K.R. was a prostitute based on supposition and rank speculation. This would have resulted in undue prejudice and confusion to the jury. Moreover, the introduction of such evidence would have violated Rule 412, as a sufficient basis would not have existed for its admissibility.

Another part of Mitchell's argument is that the Government admitted that K.R. was a prostitute when it "blurted out" and used the word prostitute in its closing argument. According to Mitchell, the Government acknowledged what he had been arguing all along but was precluded from eliciting testimony on the subject matter. In closing argument, the Government's counsel stated:

> Folks, she [K.R.] could have left it all here. She could have hopped on a bus and [gone] back to Oklahoma, and no one would have known what happened that night, not her father, not her future husband. Her daughter could have grown up thinking that she's that church girl that you saw on that witness stand, instead of a drug-addicted prostitute, or stripper, or whatever inference you want to draw, that was raped and brutalized. I submit to you the only reason anyone would do that is because they are telling the truth.

Tr. Vol. 8 at _____.

As the Government fought so vehemently to keep out any evidence that K.R. may have been a prostitute, it should never have made the reference to "prostitute," and the Government needs to stop minimizing the effect of its conduct, as this is not the first time it has downplayed unnecessary and unwarranted conduct on its part. The ultimate question, however, is whether the statement constitutes an admission or acknowledgment by the Government that K.R. was engaged in prostitution.

In addressing Mitchell's contention, the court first notes that he did not object to this portion of the Government's closing argument. Second, as previously stated, the court allowed Mitchell the opportunity to revisit and further develop his theory that K.R. was engaged in prostitution; however, Mitchell never took advantage of the opportunity. Third, although Mitchell never used the word "prostitute" or "prostitution" in his opening statement, he came precariously close to implying that K.R. was engaged in prostitution. Fourth, the statement by the Government was not an admission or acknowledgment that K.R. was a prostitute. A fair reading of the

statement does not convince the court that the statement has the meaning or interpretation that Mitchell seeks to ascribe to it.  For all these reasons, Mitchell suffered no legal prejudice as a result of the statement made by the Government's counsel in closing argument.

### 5.      Late Production of K.R.'s Medical Records

Mitchell contends that the late production of K.R.'s medical records prevented him from a meaningful analysis of those records to use for impeachment purposes.  He never informed the court that he needed more time to review or study K.R.'s medical records.  Had he raised the issue and convinced the court that he would be legally prejudice because of inadequate time to review the medical records, the court would have granted Mitchell a brief continuance for further review and analysis of K.R.'s medical records.  Thus, the allegedly late production of K.R.'s medical record may not serve a reason to grant a new trial.

### 6.      K.R.'s Drug Case

Mitchell contends that the court erred when it did not allow him to discuss K.R.'s drug case in which she received deferred adjudication.  The court held, citing *United States v. Hamilton*, 48 F.3d 149, 153 (5th Cir. 1995), that evidence regarding K.R.'s drug case would not be admitted because evidence that a party received a sentence of deferred adjudication was inadmissible under Federal Rule of Evidence 609.

When Mitchell realized that "this dog would not hunt," he advanced another theory.  Citing *Davis v. Alaska*, 415 U.S. 308 (1974), Mitchell contends that the court erred by not allowing evidence concerning the deferred adjudication.  In *Davis*, the Court held that the refusal to allow a defendant to cross-examine the key prosecution witness to show his probative status denied such defendant his constitutional right of effective cross-examination.  *Id.* at 318.  Mitchell contends that under *Davis*, he should have been allowed to question K.R. regarding her state case to explore

any underlying facts that would show bias or a lack of impartiality that is expected of a witness at trial.  His contention was that the Government could charge her for the same state offense for which she received deferred adjudication and that K.R. was, therefore, beholden to testify in a way that was favorable to the Government.

The court preliminarily held that the theory advanced by Mitchell was "awfully attenuated."  The theory appeared to be based on sheer speculation.  Out of an abundance of caution, the court specifically stated that it would not rule that the evidence could not come in but that the court needed something "more substantial to indicate that there [was] a nexus."  Once again, the court allowed Mitchell the opportunity to raise this issue later during the trial, and he did not do so.  Accordingly, the arguments regarding the K.R.'s drug case cannot serve as a basis for a new trial.

### 7.      Testimony of Dr. Barbara Hoffman

Mitchell mentions that Dr. Hoffman had no opinion on whether K.R. was sexually assaulted.  Dr. Hoffman stated that she could not testify that K.R. was sexually assaulted.  The court ruled, which in retrospect was probably a mistake, that Dr. Hoffman was a fact witness and not expressing an opinion when she testified that she could not determine whether K.R. was raped. Regardless of the court's ruling, Dr. Hoffman's statement was one favorable to Mitchell. Moreover, the court's ruling and the statement of Dr. Hoffman did not affect a substantial right of Mitchell, and he has suffered no legal prejudice as a result of the court's ruling on Dr. Hoffman's testimony.

## IV.    Conclusion

For the reasons herein stated, the court **concludes** that a reasonable jury could have found that the evidence and testimony established beyond a reasonable doubt that Defendant Steric Paul

Mitchell committed each of the essential elements of offense charged in Count One of the Indictment.  Accordingly, the court **denies** Defendant's Motion for Acquittal.  With respect to Defendant's Motion for New Trial, the court **determines** that the arguments advanced by Mitchell have been waived or have no merit.  Therefore, for the reasons herein stated, the court **concludes** the evidence with respect to Counts One and Three does not so heavily preponderate against the verdict rendered as to result in a miscarriage of justice.  Accordingly, the court **denies** Defendant's Motion for New Trial.

      **It is so ordered** this 18th day of August, 2016.

                                    Sam A. Lindsay
                                    United States District Judge